### Ex parte MARSHALL.
### Civ. A. No. 481–49.

United States District Court
D. New Jersey.
July 1, 1949.

J. Randolph Appleby, III, South River, N. J., for petitioner.

Frank H. Pierce, Augusta, Ga., for intervenor, Board of Commissioners of

Roads and Revenue of Richmond County, Ga.

FORMAN, District Judge.

James Marshall filed a petition for a writ of habeas corpus alleging that he was held prisoner by the Sheriff of Middlesex County, at New Brunswick, New Jersey, under a warrant issued by the Governor of New Jersey at the demand of the executive authority of the State of Georgia by reason of the petitioner's escape from confinement in that State. The petitioner further recited that he had been convicted of robbery and confined to the Richmond County Prison Farm in Georgia, where he alleged he was "subjected to constant, cruel, barbaric and unusual punishment in violation of the 14th Amendment to the Constitution of the United States prohibiting the infliction of cruel and inhuman punishment by a state"; that he was, while so confined, "the victim of numerous cruel and inhuman incidents at the hands of his jailors to the extent that his life and health were in great jeopardy", and that if returned to the State of Georgia he must finish a term of 36 to 60 years under the conditions above described. He prayed for his discharge.

Counsel, appointed to represent the petitioner by the Judge of the Middlesex County Court, in submitting the petition to this court on the afternoon of June 16, 1949, orally represented that he had made application to that court for a writ of habeas corpus and had been informed by the Judge that he intended to deny the application the morning of June 17, 1949. The writ was thereupon allowed and made returnable June 27, 1949.

On the return day the Sheriff of Middlesex County made his return to the writ and produced the petitioner in court. An application to intervene on behalf of the State of Georgia was made by counsel to the Board of Commissioners of Roads and Revenue of Richmond County, Virginia, and was granted.

The petitioner testified that in 1943 he was convicted of a charge of robbery and was sentenced to serve a term of from 36 to 60 years, following which he was received at the Richmond County Jail and assigned to the Richmond County Stockade or Public Works Camp situate on the outskirts of Augusta, Georgia. Together with other prisoners he left the Stockade each morning in fair weather, although on occasion in rainy weather too, and was driven by motor truck to some place along the county road system where he worked on the roads and ditches to make and maintain them. The working party was in charge of a foreman, David Turner, and a number of guards. The guards were armed with shotguns. The foreman carried a hickory stick approximately four feet long with which he beat petitioner and other prisoners whenever he saw fit. On May 5, 1944, petitioner made his escape from his crew and although the guards shot at him he got away unharmed and made his way to New Brunswick, New Jersey, where his mother and a brother were living. He remained in New Brunswick for a period of three years and ten months, when, through a proceeding brought against him by his wife, his status as a fugitive was revealed, and he was returned to Georgia pursuant to a warrant issued for his extradition. Again he spent four days in the Richmond County Jail and was transferred to the Stockade where he resumed his road tending work with the same crew, guards and foreman, David Turner.

He received no untoward treatment for some months after his return but thereafter the foreman began beating him with the stick and on one occasion beat him with the butt of his pistol inflicting two wounds on his scalp. He was also beaten once or twice by a guard, Alvin Jones. Again he made his escape on August 26, 1948, and returned to New Brunswick, New Jersey, and again was apprehended as a fugitive.

He asserted that he bled after the beatings and particularly after he was struck on the head and that he was never given medical attention for his wounds. He exhibited healed scars on his scalp, back and right thigh, which he claimed were all due to the beatings.

The petitioner complained of the quality of the food. He also stated that the only change made in the issue of clothing in the winter time was long underwear but no overcoat was issued to him; and that, though boots and raincoats were supplied and carried in a box on a truck, petitioner and others in crews were obliged at times to work in wet places and were not permitted to put on either the boots or raincoats.

On cross examination he admitted that he had served two prior sentences in the Richmond County Stockade; one in 1937, at which time he was subjected to beatings by David Turner; and again in 1939 when he was returned to the same place and at this time David Turner was replaced by his brother, John Turner, who similarly mistreated the petitioner. He conceded that the County Physician visited the Stockade from time to time but contended that he was never permitted to consult the doctor.

He stated that in 1939 when he was in custody at the Stockade that he was obliged to wear chains attached to his legs, a striped uniform and went out to work at "sun-up" and did not finish until "sun-down". During his third period of custody in 1943, he conceded that the practice of using chains and irons on prisoners was abolished and that prisoners were no longer compelled to wear striped garments. He testified that they left for their road work at about 7:30 in the morning, had from one to two hours rest period at noon and were returned to the Stockade at about 5:30 each afternoon.

Another witness, likewise confronted with extradition proceedings for his escape from a chain gang in Georgia in 1938, offered testimony on behalf of the petitioner as to brutal treatment and inhuman conditions experienced by him prior to his escape. However, they involved institutions of other counties at a period not later than 1938.

Walter Kent testified on behalf of the intervening demanding authority that he is Chief Deputy Sheriff of Richmond County, having been attached to the Sheriff's office for 25 years which gave him an in-timate knowledge of its facilities. He stated that it was the law and practice in Georgia for the various counties of the State to request assignment of State prisoners to maintain the county road system. In Richmond County he estimated that there were at least 350 miles of dirt roads to be maintained. The State filled such requests by assigning prisoners not held in the State Prison to the counties. Each county upon such assignment was responsible, through its Board of Commissioners, for the maintenance and care of the prisoner until his term expired, in return for which it was permitted to exact the service above mentioned. The witness conceded that the kind of maintenance provided by the counties for such prisoners depended upon the size and financial condition of the county. He asserted that Richmond County was one of the largest counties in Georgia and accordingly had provided a new County Jail building in the City of Augusta only about 12 years ago which contained the most modern custodial institutional improvements. The other facility provided was known as the Richmond County Stockade or Public Works Camp in which the prisoners who worked on the roads were quartered. When weather permitted them to do their work, they left in the morning to go to their tasks and returned at the end of each afternoon.

As Chief Deputy Sheriff, the witness was in charge of 22 deputies who performed police work through out the county and while his office had no control or supervision of the Stockade, he had nearly daily occasion to be at that institution. The Stockade is an older brick building of three stories surrounded by 35 acres of farm land, the 10 acres immediately surrounding the building being fenced in. Within the fenced enclosure are several buildings besides the main building including a laundry, cow shed, barn, grain storage, gasoline station and a small store at which candies, notions, et cetera are sold to inmates. This enterprise was operated by a trusty who was a life termer. Other trusties were permitted to make purchases for the inmates.

The main building was of three floors. The first floor was devoted to kitchens, and utility purposes. The second floor was utilized for office and dormitory space. The south side contained the dormitory for white prisoners, the center section, a dormitory for colored prisoners and the north side was reserved for a hospital. Living quarters for guards occupied the third floor. The sleeping quarters of the prisoners, who averaged generally between 60 and 70, were furnished with beds and bed clothing for each inmate. Steam heat was provided in the winter season.

The entire institution, according to the witness, was kept in a clean and sanitary condition, particularly the kitchen and feeding sections where he said that he often ate with the guards at the Stockade. Vegetables were raised on the farm and were fed to the inmates as well as other staples and, from his observation, the food given the prisoners was wholesome and sufficient. Cold storage food boxes had been installed and a plentiful supply of food was kept in refrigeration. Prisoners were assigned as cooks and these and other trusties were allowed the freedom of the enclosure. On his patrol over the county roads, the witness saw crews of prisoners at work. He had observed that chains and stripes were abandoned some years ago and the men no longer worked from "sun-up to sun-down".

The witness further testified that he personally investigated charges against David Turner and Alvin Jones, respectively foreman and guard at the Richmond County Stockade, that they had assaulted prisoners in their charge. These were the same individuals whom petitioner alleges beat him. As a result Turner was indicted and convicted of assault on 5 or 7 prisoners and Jones on one. Neither is any longer employed by the State of Georgia or Richmond County. The witness could not place the time of the convictions of Turner and Jones precisely, but recalled that it was in 1948.

On behalf of the intervenor was also called the respondent Wall, Sheriff of Middlesex County, New Jersey, where petitioner is now held in custody to show the comparability of the Middlesex County, New Jersey, Workhouse with the Richmond County, Georgia Stockade. Conditions described with regard to food, confinement and discipline did not differ greatly except that county workhouse prisoners in New Jersey are received for terms of not more than two years, whereas they are held for an unlimited period under the system of assigning prisoners to counties in Georgia.

The petitioner relied for his discharge upon the decision of the Court of Appeals for the Third Circuit in the case of Johnson v. Dye, 175 F.2d 250, in which it was held that the doctrine of exhaustion of State remedies in habeas corpus cases does not apply to interstate rendition. The case further held that "the obligation of a State to treat its convicts with decency and humanity is an absolute one and a federal court will not overlook a breach of that duty." The locale of the confinement of the petitioner therein was Cobb County, Georgia, and the proofs involved the penal system of that county although the court took notice of the "known facts concerning the working of the Georgia penal system at the time of the petitioner's sentence." The court further pointed out that the State "failed also to observe the explicit mandates of her own Constitution which pointedly, as if the very evil here under consideration was in mind, go as far, if not farther, than those of the Eighth Amendment to the Constitution of the United States." Therefore, because the petitioner had been exposed to past inhuman treatment, he had to be "set at liberty for the State of Georgia has failed signally in its duty as one of the sovereign States of the United States to treat a convict with decency and humanity."

The facts in this case cannot be reconciled with the condemnation of the Georgia penal system in the Johnson case. In the latter case, although specifically invited, no representative of Georgia appeared before the Court. In this case the representative of Richmond County, Georgia, requested permission to intervene and offered affirmative proof that the leg irons, striped garments and "sun-up to sun-

"down" hours have been eliminated and no longer are tolerated in its institutions and were not at the time petitioner escaped. Likewise, the evidence shows that the very men whom the petitioner accuses of having mistreated him have been punished for similar treatment of other inmates. Nor does there appear to be an element present of anticipation of possible reprisal action, as alleged by the petitioner. When the petitioner escaped the first time, he was not subjected upon return to reprisal treatment and he testified that nothing untoward occurred until three or four months following his return when the two guards, subsequently convicted, subjected him to the beatings.

No allegation made by the petitioner concerning cruel and inhuman punishment was sustained by convincing or persuasive proof in the light of the testimony of the witness from Georgia except that his charges that he was beaten by Turner and Jones appear to be true. In the face of the testimony that they have been prosecuted and are no longer in the service of the county it would appear that Richmond County does not tolerate treatment of its prisoners who labor on its roads in the manner generally ascribed to Georgia in the Johnson case.

The petitioner, however, insists that a finding that he was beaten by Turner is sufficient to bring him within the holding in the Johnson case. With this position I cannot agree. To do so would be to set at large every criminal who having been mistreated by an employee in another state penal institution, escapes to one of the states of this circuit. The decision in the Johnson case contemplated the general brutal conditions existing in the prison or chain gang described by the petitioner in that case and other witnesses without contradiction. In this case there is proof which the court has no reason to doubt that Richmond County, Georgia, at the time of petitioner's escape had taken steps to make effective Article I of the Bill of Rights of the Georgia Constitution of 1877, readopted without amendment in 1945 that no "person [shall] be abused * * * in prison" by punishing the two guards and generally otherwise not countenancing cruel and inhuman treatment in the Stockade from which petitioner fled.

Under such view the writ of habeas corpus will be discharged and the petitioner remanded to the custody of the Warden of the Middlesex County Jail, but he shall not deliver him to the authorities of the State of Georgia until time has been allowed for the petitioner to perfect an appeal from this decision to the Court of Appeals of the Third Circuit and until the decision of that court has been pronounced, if such an appeal is taken.

An order will be made consistent with these conclusions.